# In the United States Court of Federal Claims

No.  11-658L

(Filed:  March 11, 2014)
_____

| | |
|---|---|
| SKOKOMISH INDIAN TRIBE, a federally recognized Indian tribe in its own capacity, as a class representative and as parens patriae, *et al*., | * |
| | * Treaty/takings case; Motion to dismiss for |
| | * lack of subject matter jurisdiction – RCFC |
| | * 12(b)(1); Transferred case under 28 U.S.C. § |
| | * 1631; 28 U.S.C. § 1500; Pending – *County of* |
| | * *Cook*; Same operative facts; Four *Klamath* |
| Plaintiffs, | * tests applied; Claims dismissed by district |
| | * court and Ninth Circuit involved substantially |
| v. | * the same operative facts as claims before |
| | * court; Section 1500 applicable; Complaint |
| THE UNITED STATES, | * dismissed. |
| | * |
| Defendant. | * |

_____

## OPINION
_____

*Mason D. Morisset*, Morisset, Schlosser, Jozwiak & Somerville, Seattle, WA, for plaintiffs.

*Reuben S. Schifman*, Environment and Natural Resources Division, United States Department of Justice, with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

This is an action for damages brought by the Skokomish Indian Tribe (the Tribe), as well as the individual members of the Tribe, deriving from the construction and operation of the Cushman Hydroelectric Project, upstream from the Tribe's reservation.  Plaintiffs allege that defendant failed to protect their interests with respect to the licensing and operation of the hydroelectric project, thereby violating its obligations arising under a treaty as well as various statutes.  Plaintiffs further aver that defendant's actions effectuated a temporary takings under the Fifth Amendment.  Defendant has moved to dismiss plaintiffs' claims, arguing, *inter alia*, that 28 U.S.C. § 1500 deprives this court of jurisdiction.  For the reasons that follow, the court hereby **GRANTS** defendant's motion and orders the dismissal of plaintiffs' complaint.

## I.      BACKGROUND

A brief recitation of the facts provides necessary context.[1]

On January 26, 1855, the Tribe and the United States entered into the Treaty of Point-No-Point (the Treaty), in which the Tribe ceded most of its land, located in northwest Washington State, and retained an approximately four-thousand acre reservation near the mouth of the Skokomish River.  The Treaty guaranteed the Tribe the right to fish, hunt, and gather roots and berries outside the reservation, on land that had been traditionally used for those purposes.

The Skokomish River, and particularly its North Fork, was a rich habitat and breeding area for many species of salmon, which were the backbone of the Tribe's economy and integral to its culture, subsistence and religion.  The North Fork lies outside the Skokomish Reservation, but was among the Tribe's treaty-protected fishing grounds.  Besides hunting and fishing, the Skokomish Reservation included a number of orchards, farm lands and hayfields, which provided income and subsistence to Tribal members.

In 1913, various parties were considering building hydroelectric dams on the North Fork of the Skokomish River.  At that time, the Tribe and its members expressed concern to officials of the Departments of the Interior and Justice that constructing a dam on the North Fork would harm the Tribe, its lands and fishing.

Notwithstanding these concerns, in 1924, the City of Tacoma (Tacoma) obtained a license from the Federal Power Commission (FPC) to flood 8.8 acres of national forest land by damming the North Fork of the Skokomish River.  The license was designated a "minor part" license because it covered only a small part of Tacoma's much larger Cushman Hydroelectric Project (the Cushman Project).  Plaintiffs allege that the Cushman Project diverted the entire North Fork of the Skokomish River from its watershed, thereby decimating fish runs and destroying the Tribe's usual and accustomed fishing places, including fishery and estuary habitats on the Skokomish River.

The Tribe attempted to prevent the development of the Cushman Project, but its efforts to sue allegedly were hindered by defendant.  Under then-existing Federal law, the Tribe could not enter into a contract with an attorney without the approval of the Secretary of the Interior.  *See* Act of May 21, 1872, c. 177, 17 Stat. 136.[2]  On October 2, 1930, the Tribe sued Tacoma in the

---

[1]  These facts are primarily drawn from plaintiffs' complaint and, for the purpose of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 589 (2007). Additional procedural details are drawn from the docket of plaintiffs' district court case.

[2]  The disability of Tribes to sue on their own behalf in federal courts derived from the Supreme Court's 1831 holding in *Cherokee Nation v. Georgia* that "an Indian tribe or nation within the United States is not a foreign state in the sense of the constitution, and cannot

United States District Court for the District of Washington, seeking to enjoin the city from diverting the North Fork out of its watershed.  The complaint was dismissed by the district court, which found that the Tribe could not represent itself and could be represented only by the United States.  On October 30, 1930, the Tribe asked the Acting Commissioner of Indian Affairs to provide it with legal representation to sue Tacoma.  The Acting Commissioner declined.

In 1963, the FPC determined that the "minor part license" it issued in 1924 to Tacoma had been improperly granted, finding that its jurisdiction extended to whole projects, not just the parts that occupy or use federal land.  *See Pac. Gas & Elec. Co.*, 29 FPC 1265, 1266 (1963).  In 1974, Tacoma's license expired and the city applied for a new license, this time seeking a "major project license" that would cover all of its project-related facilities.  In 1975, the Tribe intervened in this relicensing proceeding; the United States, however, refused to fund the studies the Tribe needed to quantify the injuries it had incurred from the Cushman Project.  On December 28, 1979, Interior acknowledged that Tacoma had illegally condemned land on the Skokomish Reservation to build the Cushman Project, and had interfered with the Tribe's water and fishing rights.  On February 8, 1980, Interior recommended that the Justice Department bring suit against Tacoma in order to compensate the Tribe for the derogation of their fishing and water rights in connection with the project.  But, the Justice Department filed no such action.

Pursuant to section 15 of the Federal Power Act (the FPA), 16 U.S.C. § 808(a)(1), the FPC's successor agency, the Federal Energy and Regulatory Commission (FERC), must issue annual renewals of an existing license during the application review period that precedes issuance of a new long-term license.  In the case of the Tacoma license, this provision was applied in the extreme – for twenty-four years, through 1998, FERC issued annual licenses to Tacoma to run the Cushman Project.  None of these licenses made any provision to protect the Reservation or mitigate the harm to Treaty-protected resources.

Meanwhile, in 1996, defendant released  technical studies documenting the damage caused or aggravated by the Cushman Project.  These studies established that although some of the damage to the Tribe's treaty-protected property and rights occurred shortly after the Cushman Project was constructed, most of the damage occurred gradually over time.  That same

---

maintain an action in the courts of the United States."  30 U.S. 1, 20 (1831).  The Act of 1872 prevented Tribes from hiring their own attorneys without government approval.  Act of May 21, 1872, c. 177, 17 Stat. 136.  The legislative history of the Act shows that "contractual relations with attorneys and claims agents [whom it was suspected would take advantage of tribes] were foremost on Congress' mind."  *U.S. ex rel. Shakopee Mdewakanton Sioux Community v. Pan American Management Co.*, 616 F. Supp. 1200, 1217 (D. Minn. 1985); *see also U.S. ex rel. Steele v. Turn Key Gaming, Inc.*, 260 F.3d 971, 976-77 (8th Cir. 2001) (citing Cong. Globe, 41st Cong., 3d Sess. 1483, 1483-87 (daily ed. Feb. 22, 1871)).  The Indian Reorganization Act of 1934 finally vested in Tribes the ability to employ legal counsel upon the enactment by a Tribe of a constitution incorporating such power.  *See* 25 U.S.C. § 476; *see also Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (quoting H.R. Rep. No. 1804, 73rd Cong., 2nd Sess., 6 (1934)).

year, FERC published its Final Environmental Impact Statement relating to impacts of the Cushman Project.  On August 4, 1997, the Secretary of the Interior prescribed conditions under the FPA for the protection and utilization of the Skokomish Reservation in any license issued for the operation of the Cushman Project.  On July 30, 1998, FERC issued a new 40-year license for operation of the Cushman Project, but expressly declined to include the Section 4(e) conditions prescribed by the Secretary of the Interior.[3]  The Tribe timely petitioned the United States Court of Appeals for the D.C. Circuit for review of the FERC decision.

On or about November 24, 1998, plaintiffs also filed a claim with the Department of Interior under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80, seeking damages arising out of defendant's conduct with respect to the licensing of the Cushman Project.  On May 20, 1999, Interior denied this claim.  On May 21, 1999, FERC stayed all conditions of Tacoma's new license pending judicial review.

On November 19, 1999, the Tribe and individual members filed suit in the United States District Court for the Western District of Washington against defendant, Tacoma, and Tacoma Public Utilities, seeking "declaratory relief and damages related to the construction, operation, and maintenance of the Cushman Project, a hydroelectric project located in Mason County, Washington."  There were 34 counts in this complaint, including seven directed at the United States.  One of the claims was for negligence, predicated upon defendant's "breach of duties" under, *inter alia*, the FPA, the common law and the Treaty.  The latter, the plaintiffs averred, obliged defendant "to take action to protect federal rights held by Indian Tribes and individual tribal members," including "treaty fishing and shellfishing rights."  While these claims principally focused on defendant's issuance of a license to Tacoma for the Cushman Project and its failure to limit that license, they also cited defendant's failure to support the Tribe's efforts to sue to enjoin the project.  Plaintiffs also filed tort claims directed at the United States for trespass, the creation of public and private nuisances, conversion and tortious interference with property.  Lastly, the complaint alleged that defendant's "unlawful actions and omissions as described herein constitute[d] agency action" that violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06.

On June 4, 2001, the district court dismissed twenty counts (1-15, 20, 22, 27, 30 and 35) – primarily those based on treaty rights – and correspondingly dismissed the United States as a party to the action.  On August 9, 2001, the district court dismissed the remaining fourteen counts.  *See Skokomish Indian Tribe v. United States*, 161 F. Supp. 2d 1178, 1179 (W.D. Wash. 2001).  On June 3, 2003, the Ninth Circuit affirmed the district court's judgment.  *Skokomish Indian Tribe v. United* States, 332 F.3d 551 (9th Cir. 2003).  On February 23, 2004, the Ninth Circuit granted a petition for rehearing *en banc*.  *Skokomish Indian Tribe v. United States*, 358 F.3d 1180 (9th Cir. 2004).

---

[3]  The new license did require Tacoma to release certain amounts of water into the North Fork riverbed, partially covering one of Interior's conditions.

On June 3, 2005, the Ninth Circuit, sitting *en banc*, ruled against the Tribe on its FPA claims, as well as its state-law based claims (*e.g.*, 42 U.S.C. § 1983), affirming the district court's judgment on those counts. *Skokomish Indian Tribe v. United* States, 410 F.3d 506 (9th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1090 (2006). Regarding the Tribe's FTCA claims, the court concluded that "[t]he Tribe's claims against the United States are properly characterized not as tort claims, but as claims that the United States violated its obligations under the Treaty," adding that "[t]he Tribe is not claiming the United States behaved tortiously, but rather that the United States failed to abide by its contractual obligations to the Tribe under the Treaty." *Id.* at 510. Invoking the Federal transfer statute, 28 U.S.C. § 1631, the Ninth Circuit transferred the Tribe's Treaty-based damages claims against the United States to this court.

On January 26, 2006, the Ninth Circuit issued its mandate. Thereafter, plaintiffs moved the district court to effectuate the mandate. On May 9, 2006, the district court transferred to this court "the Claims against the United States." The case was not docketed in this court at that time purportedly because a related appeal was still pending before the Ninth Circuit.

On August 22, 2006, in *City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006), the D.C. Circuit held that FERC was required to include the Section 4(e) conditions issued by the Secretary of the Interior in Tacoma's new license. Notwithstanding, Tacoma was allowed to continue to operate the Cushman Project under the terms and conditions of its 1924 license, without conditions for the protection of the Skokomish Reservation, until July 15, 2010, when FERC issued the final amended license order. On October 12, 2011, following the dismissal of plaintiffs' appeal in the Ninth Circuit, the Clerk docketed this case. On November 11, 2011, plaintiffs filed an amended complaint. On November 14, 2011, they then filed a transfer complaint against the United States, seeking, *inter alia*, class action status and "an award of compensatory monetary damages in an amount to be determined at trial." On April 13, 2012, defendant filed its motion to dismiss. Thereafter, the parties participated in several alternative dispute resolution sessions. On October 11, 2012, this case was reassigned to the undersigned. When a settlement did not materialize, a schedule for briefing the defendant's motion to dismiss was issued. Briefing and argument on that motion have now been completed.

## II.   DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F. 3d 1462, 1465 (Fed. Cir. 1997) (citations omitted); *see also Twombly*, 550 U.S. at 554-55. In particular, the plaintiff must establish that the court has subject-matter jurisdiction over its claims. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Defendant's banner claim is that this court lacks jurisdiction here because of 28 U.S.C. § 1500. Section 1500 of Title 28 provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500.  The plain words of this statute speak in terms of subject-matter jurisdiction and "bar jurisdiction over the claim of a plaintiff who, upon filing [with the Court of Federal Claims], has an action pending in any other court 'for or in respect to' the same claim."  *Keene Corp. v. United States,* 508 U.S. 200, 209 (1993); *see also Corona Coal Co. v. United States*, 263 U.S. 537, 540 (1924); *Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 189 (2008).  To determine whether this statute applies here, the court must answer two fundamental questions: (i) whether the district court action was "pending" at the time jurisdiction under section 1500 is measured; and (ii) if so, whether the claims presented to the district court were the same as those in the instant case.  *See Klamath Irr. Dist. v. United States*, 113 Fed. Cl. 688, 693-94 (2013); *see also Kaw Nation of Oklahoma v. United States*, 103 Fed. Cl. 613, 617 (2012); *Griffin v. United States*, 85 Fed. Cl. 179, 184 (2008), *aff'd*, 590 F.3d 1291 (Fed. Cir. 2009).

### A.    Was Plaintiffs' District Court Complaint "Pending"?

In assessing whether section 1500 requires the dismissal of this case, account must be given to the fact that this lawsuit was transferred here under 28 U.S.C. § 1631.  The express terms of the latter provision require this court to treat the transferred claim "as if it had been filed . . . on the date upon which it was actually filed in . . . the court from which it is transferred."  28 U.S.C. § 1631.  By operation of this provision, the claims transferred by the Ninth Circuit and those claims decided by the Ninth Circuit are deemed to have been filed concurrently because they were part of the same complaint, originally filed in the district court.  The Federal Circuit has held that such transferred and non-transferred claims should be treated, for purposes of section 1500, as having been filed "simultaneously," that is, at exactly the same time.  *See United States v. County of Cook, Ill.*, 170 F. 3d 1084, 1090 (Fed. Cir. 1999); *see also d'Abrera v. United States*, 78 Fed. Cl. 51, 56 (2007).  But does that mean that the district court action here should be deemed "pending" at the time the transferred claim was filed, so as to trigger section 1500?

While a strong argument can be made that the answer to this question should be "no," *see Griffin*, 85 Fed. Cl. at 184-85,[4] the Federal Circuit has, on three separate occasions, held that

---

[4]  In *Griffin*, the undersigned applied *County of Cook*, but then vigorously argued that it was wrongly decided.  The Court noted that the plain meaning of the present participle "pending" was inconsistent with the circuit's holding and asserted that considerable tension exists between the rationale in *County of Cook* and *Tecon*.  85 Fed. Cl. at 186-87.  Discussing extensively the legislative history of section 1500, the court also observed that that history provided no basis to depart from the plain meaning of the statutory language.  *Id.* at 188-89.  Finally, the court found that the expanded definition of "pending" employed in *County of Cook* had the effect of

claims deemed simultaneously filed under section 1631 are, as a matter of law, "pending" with respect to each other for purposes of section 1500. *See Griffin v. United States*, 590 F.3d 1291 (Fed. Cir. 2009); *Harbuck v. United States*, 378 F.3d 1324, 1328 (Fed. Cir. 2004); *United States v. County of Cook*, 170 F.3d 1084, 1090 (Fed. Cir. 1999). Based on these binding precedents, the court has no choice but to conclude that plaintiffs' district court complaint was "pending" on the date that their other claims were transferred here.

## B.    Same Operative Facts

For section 1500 to apply, the suit in question and that in the district court must also be "for or in respect to" the same claims. In *Tohono*, the Supreme Court held that this requirement is met when two claims are "based on substantially the same operative facts, regardless of the relief sought in each suit." *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1731 (2011); *see also Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013); *Trusted Integration*, 659 F.3d at 1164. This court has emphasized that "determining whether two claims are 'based on substantially the same operative facts' requires more than a side-by-side comparison of the two complaints to see how much verbiage is in common." *Petro-Hunt, L.L.C. v. United States*, 105 Fed. Cl. 37, 43 (2012); *see also Resource Investments, Inc. v. United States*, 114 Fed. Cl. 639, 648 (2014); *Klamath*, 113 Fed. Cl. at 699. In order to conduct meaningful comparisons, the court must "first isolate the facts in the complaint that are 'operative,' *i.e.*, those that must be proven in order to recover on a given claim." *Petro-Hunt*, 105 Fed. Cl. at 43; *see also Klamath*, 113 Fed. Cl. at 699-700.

So which facts are "operative"? In *Klamath Irrigation District*, this court, as part of an extensive analysis of this issue, observed that cases involving section 1500 generally fall into one of three categories: (i) "repackaged suits," in which the same suit is essentially filed in both courts; (ii) "necessarily sequential" suits, in which the claimant must establish a factual or legal predicate in some other court as a precursor to prevailing in this court; and (iii) "optionally sequential" suits, in which a claimant chooses first to challenge the validity of an agency action and pursues a monetary remedy if it is unable to overturn the agency action. *Klamath*, 113 Fed. Cl. at 700-02. While these categories are helpful in identifying the types of issues that arise in section 1500 cases, they do not in themselves answer the core question of which facts are "operative."

In answering that question, this court in *Klamath* observed that the "same operative facts" standard established by the Supreme Court in *Tohono* has long been used by courts in determining whether cases present the same claims for purposes of Federal Rules of Civil

---

undercutting section 1631, while having little impact on reducing duplicative litigation (except for the unwary). *Id*. at 193-94. The undersigned is not alone in casting doubt on the correctness of *County of Cook*. *See Griffin v. United States*, 621 F.3d 1363, 1364 (Fed. Cir. 2010) (Plager, J., responding to the decision of the court to deny panel rehearing and rehearing en banc); *Lan-Dale Co. v. United States*, 85 Fed. Cl. 431, 435 (2009); Emily S. Bremer & Jonathan R. Siegel, "Clearing the Path to Justice: the Need to Reform 28 U.S.C. § 1500," 65 Ala. L. Rev. 1, 23 (2013).

Procedure 13, 15 and 20.  *Id*. at 704-08.  Synthesizing the many cases decided under those rules, this court in *Klamath* held that:

> In deciding whether two claims are the same for purposes of section 1500, . . . the court should ask and ultimately answer four questions:
>
> (i)  Are the issues of fact and law raised by the two claims largely the same?
>
> (ii)  If an adverse merits decision were rendered on the earlier claim, would the doctrine of *res judicata* bar a subsequent suit on the later-filed claim?
>
> (iii)  Will the plaintiff rely on substantially the same evidence to support each of the two claims?
>
> (iv)  Is there any other logical relationship between the two claims?

*Id*. at 708; *see also McKown v. United States*, 114 Fed. Cl. 553, 556 (2014).  "Through the prism of these tests," the court stated, "the Supreme Court's definition of the word 'claim' in the context of section 1500 comes into better focus, particularly as applied to difficult cases." *Klamath*, 113 Fed. Cl. at 708.  Relying on Federal Circuit precedents, the court held that "an affirmative answer to any one of these questions should lead to two claims being viewed as the same for purposes of section 1500."  113 Fed. Cl. at 798 (citing *Vivid Techs., Inc. v. Am. Science & Eng'g*, 200 F.3d 795, 801 (Fed. Cir. 1999); *McKown*, 114 Fed. Cl. at 556.

In applying these four tests to a case involving a transfer motion under section 1631, the court must compare the non-transferred claims to the claims transferred here.  *County of Cook*, 170 F.3d at 1091; *Griffin*, 85 Fed. Cl. at 184.[5]  Accordingly, for our purposes, it is important to understand which claims against the United States remained with the district court and the Ninth Circuit and which were transferred here.

---

[5]  In *County of Cook*, four claims were at issue:  Counts II and IV, which sought back taxes from the United States, and Counts III and V, which sought just compensation for an alleged takings.  Counts II and III were for one time period (1985-93), while IV and V were for another (1977-84).  *Id*. at 1086.  Cook County moved to transfer Counts III and V, the takings claims, to this court.  *Id*. at 1087.  After the Federal Circuit decided that the non-transferred claims (Counts II and IV) were pending when the transferred claims (Counts III and V) were filed with this court, it then considered whether the former claims were the same as the latter for purposes of section 1500.  Without considerable elaboration, the court declared that "Counts II and III (and Counts IV and V) are the same 'claim' for purposes of § 1500.  Both counts clearly arise out of the same operative facts, and both counts seek the same relief – money with interest, albeit under different theories (tax law versus a Fifth Amendment takings theory)."  *Id*. at 1091.

### 1.     Plaintiffs' Claims in the Respective Courts

Plaintiffs' district court complaint catalogued actions taken by defendant and others with respect to the Tribe and the Cushman Project, covering the implementation of the Treaty; the relationship of the Skokomish to their land and natural resources; and the effect of the Cushman Project (including economic damages) on the same.  These background facts were followed by 34 counts,[6] seven of which were against the United States.  Six of the latter invoked the FTCA and sought damages for harm caused to plaintiffs' property by:  negligence, trespass, public nuisance, private nuisance, conversion, and tortious interference.  Scattered within these counts were assertions that defendant had breached duties owed the Tribe under the Treaty, federal common law, and a range of statutes, including the FPA and several provisions in Title 25 of the U.S. Code.  These counts alleged a wide range of wrongful acts, including errors in FERC's handling of the licensing process; defendant's failure to take legal and other actions to protect the Tribe's rights; and defendant's complicity in allowing Tacoma to trespass upon and take possession of the Tribe's properties and interests.  Unlike the first six counts, the seventh count against defendant sought injunctive relief and averred that the unlawful acts and omissions that gave rise to the aforementioned torts violated the APA, as constituting conduct that was, *inter alia*, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and unsupported by substantial evidence.

The district court dismissed these seven claims, thereby dropping the United States as a party to the action.  161 F. Supp. 2d at 1179.  Although it originally affirmed this ruling, 332 F.3d 551, the Ninth Circuit granted plaintiffs' petition for rehearing *en banc*.  358 F.3d 1180.  In its *en banc* opinion, the Ninth Circuit did not disturb the panel's affirmance of the district court's APA ruling – indeed, it appears this issue was not raised.  Instead, the *en banc* court focused on plaintiffs' damage claims against the United States.  The court bifurcated those claims, creating two categories:  those based on the Treaty and those based on the FPA.  410 F.3d at 510-12.  To be clear, the *en banc* court accomplished this not by placing entire counts into one of these baskets, but by dissecting the individual counts into two strands – one relating to breaches of the Treaty, the other to breaches of the FPA.

The Ninth Circuit noted that the Tribe's treaty-based claims involved allegations that "the United States violated its obligations under the Treaty by allowing continued operations of the Project and by failing to take legal action on the Tribe's behalf or fund litigation."  *Id.* at 510.  These claims, the Ninth Circuit opined, were not brought properly as torts under the FTCA, but were instead "best . . . characterized as arising under the Tucker Act, 28 U.S.C. § 1491, or its counterpart for Indian claims, the Indian Tucker Act."  *Id.* at 511.  Deciding that these claims should be transferred under section 1631, the Ninth Circuit adumbrated that "[b]ecause we lack subject matter jurisdiction over the Tribe's damages claims against the United States, but believe they might properly have been brought under the Indian Tucker Act, we exercise our discretion to transfer these claims to the Court of Federal Claims."  *Id.*

---

[6] Although the complaint listed 35 counts, there was no claim in count 28.

The Ninth Circuit described the second category of claims against the United States –
those founded upon the FPA – as involving allegations that the United States:

> fail[ed] to submit and include license conditions protective of the Skokomish
> Reservation fish and wildlife, to fully consider environmental factors before
> issuing a project license, and to require evidence that the City, as a license
> applicant, possessed sufficient water rights for the Project and complied with state
> and federal laws requiring fishways at dams and prohibiting impairment of
> navigation.

*Id.* at 511.  As the panel and district court had previously held, the *en banc* court observed that
the FPA shielded the United States from any damages associated with the "construction,
maintenance, or operation" of a project.  *Id.* at 512 (quoting 16 U.S.C. § 803(c)).[7]  In recognition
of this, the court affirmed "the district court's dismissal of all FPA claims against the United
States." *Id.*

Following the transfer of the Tribe's treaty-based damages claims to this court,[8] plaintiffs
filed a "transfer complaint" in which they largely restated the background facts found in their

_____

[7]  The cited provision of the U.S. Code provides that "[e]ach licensee hereunder shall be
liable for all damages occasioned to the property of others by the construction, maintenance, or
operation of the project works or of the works appurtenant or accessory thereto, constructed
under the license, and in no event shall the United States be liable therefor."  16 U.S.C. § 803(c).

[8]  Relying on the district court's transfer order ("the Clerk shall transfer the Claims
against The United States To The Court of Federal Claims"), plaintiffs assert that the district
court transferred all their claims against the United States to this court, including their APA
claim.  They then argue that this case is governed by a footnote in *County of Cook*, in which the
Federal Circuit stated that "§ 1500 is not implicated when *all* of the claims in an action are
transferred to the Court of Federal Claims pursuant to § 1631." 170 F.3d at 1091, n. 8 (emphasis
in original).  But, this argument is factually wrong.  A review of the record here reveals that the
district court did not – and, indeed, could not – transfer all the claims against the United States to
this court.  It could not do so because the district court had previously dismissed plaintiffs' APA
claim against the United States, *see* 161 F. Supp. 2d at 1179; that ruling was not challenged by
plaintiffs in their briefs before the Ninth Circuit and was ultimately affirmed by the Ninth
Circuit's panel opinion, *see* 332 F.3d 551.  The *en banc* court did not disturb that part of the
panel's opinion. 410 F.3d 506.  Moreover, indication that the Ninth Circuit's transfer order
applied only to plaintiffs' tort-based, damages claims comes expressly from the opinion, which,
in the segment discussing the transfer, refers only to "damages" claims – "[W]e lack subject
matter jurisdiction over the Tribe's ***damages*** claims against the United States, but believe they
might properly have been brought under the Indian Tucker Act, we exercise our discretion to
transfer these claims to the Court of Federal Claims." *Skokomish*, 410 F.3d at 511 (emphasis
added).  In addition, the Ninth Circuit plainly did not transfer plaintiffs' claims against defendant

district court complaint and alleged three causes of action (each of which incorporated the aforementioned background facts).  The first of these asserted that the United States had breached its duties to the Tribe under the Treaty by acting or failing to act in fourteen separate instances that the Tribe claimed caused the derogation, damage and diminishment of its Reservation and the Tribe's Treaty-protected fishing and hunting rights.[9]  The second claim averred that the United States had breached its duties to the Tribe under the Treaty as further defined in a half dozen Federal statutes, including the FPA and various provisions in Title 25 of the U.S. Code, thereby causing damage to the Reservation and the Tribe's Treaty rights.[10]  Finally, the third claim alleged that the United States' actions involving the Cushman Project effectuated a temporary takings of a flowage easement of plaintiffs' Treaty-protected rights and natural resources, requiring that compensation be paid to the Tribe and its members under the Fifth Amendment to the Constitution.

### 2.    Application of the *Klamath* tests

It remains to apply the *Klamath* tests to compare the claims that were dismissed by the district court and the Ninth Circuit (the APA claim and the FPA strand of the tort claims) to the three claims filed here (the Treaty claim, the statutory claim and the temporary takings claim).

Under the first of the *Klamath* tests, the identity-of-issues test, the court must focus on whether the issues of fact and law raised by the two claims are "largely the same." *Klamath*, 113 Fed. Cl. at 707 (citing *Tank Insulation Intern., Inc. v. Insultherm, Inc.*, 104 F.3d 83, 85-86 (5th Cir. 1997), *cert. denied*, 522 U.S. 907 (1997).  As the word "largely" implies, this test "does not

---

to the extent that they were dependent upon the FPA, as it expressly resolved those claims against plaintiffs.  *Id*. at 511-12.

[9]  These instances include:  failing to take any regulatory or legal action to enjoin or mitigate damage flowing from the Cushman Project; restricting the Tribe from pursuing legal or regulatory action related to the Cushman Project; failing to provide funds with which the Tribe could pursue legal action; allowing the continued operation of the Cushman Project when it was known to be operating beyond the scope of its license; issuing the initial and subsequent licenses to the Cushman Project without imposing conditions for the protection of the Tribe; failing to seek compensation on behalf of the Tribe for the operation of the Cushman Project or the damage it caused to the Tribe; and failing generally to take other actions that would satisfy the duties of a trustee under the Treaty.

[10]  The actions and omissions that underlie the alleged breaches of duty in the second count are the same as in the first count.  The statutes creating the alleged duties are:  the Indian Non-Intercourse Act, 25 U.S.C. § 177; the Act of June 30, 1834, 25 U.S.C. § 180; the Act of March 3, 1893, 25 U.S.C. § 175; the Act of June 25, 1910, 25 U.S.C. § 406-407; the Indian Reorganization Act of 1934, 25 U.S.C. § 466; the American Indian Agricultural Resource Management Act of 1993, 25 U.S.C. § 3711; and the Federal Power Act of 1920, 16 U.S.C. § 797(e).

require a complete overlap between" the claims.  6 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, Adam N. Steinman, Fed. Prac. & Proc. Civ. § 1410 (3rd ed. 2013) (hereinafter "Wright & Miller"); *see also Papadopoulos v. Douglas*, 268 F.3d 1063 (5th Cir. 2001) (per curiam); *Klamath*, 113 Fed. Cl. at 710; *CheckPoint Fluidic Sys. Intern., Ltd. v. Guccione*, 2011 WL 3268386, at *7 (E.D. La. July 28, 2011).

In key regards, the APA claim, rather than the FPA portion of the tort claims, supplies the sockdolager here.  Although this case is still at the pleadings stage, a comparison of the relevant claims suggests that this case is a "repackaged" suit – one reflecting damage claims that mirror the injunctive APA claim filed in the district court.  *See Central Pines Land Co., L.L.C. v. United States*, 697 F.3d 1360, 1365 (Fed. Cir. 2012); *Klamath*, 113 Fed. Cl. at 710; *see also British American Tobacco Co. v. United States,* 89 Ct. Cl. 438, 439-40 (1939) (per curiam), *cert. denied*, 310 U.S. 627 (1940) (applying section 1500 where plaintiff sought tort damages in the district court and contract damages in the Court of Claims).  In sweeping terms, the APA claim captured all the other Federal claims in the district court case, stating:

> For purposes of relief sought herein for other than monetary damages, Defendant United States's unlawful actions and omissions as described herein constitute agency action that violates the Administrative Procedure Act, 5 U.S.C. § 701 as: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure requires by law; unsupported by substantial evidence; and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

Given the extraordinary breadth of this claim, it should come as no surprise that, in terms of the issues of fact and law presented, the APA claim thus subsumed all the breach claims that were contained in the district court complaint, including the six tort claims that, reformulated, gave rise to the two breach claims here.  To put it bluntly, the APA claim and those breach claims cover essentially the same ground.  All that differs between them is the nature of the relief requested – injunction versus damages – and it is well-accepted that differing relief is insufficient to distinguish two claims for purposes of section 1500.  *See Tohono*, 131 S.Ct. at 1731; *Keene Corp.*, 508 U.S. at 212; *Trusted Integration*, 659 F.3d at 1166.

If this were not enough, there is also considerable overlap between the facts underlying the FPA claims raised by plaintiffs in the district court and the breach claims raised here.  On brief, plaintiffs argue that they did not separately set forth in their district court complaint claims predicated upon the FPA.  But, as both the district court and Ninth Circuit recognized, their claims plainly were based upon asserted violations of that statute.  This conclusion is well-evidenced not only by the narrative in the district court complaint, but by the six tort claims (particularly, the ones asserting negligence and trespass), all of which complain of a variety of actions taken by FERC in terms of the licensing process and the agency's failure to take steps to

protect the Tribe's treaty-reserved rights.[11]  The FPA portion of those claims was decided by the district court and, in turn, the Ninth Circuit – those strands, therefore, were not transferred. Accordingly, the FPA portion of those claims provides a basis for determining whether the claims here substantially involve the same issues of fact and law as in the district court.  And that comparison (particularly as to plaintiffs' second breach claim in this court) yields further support for the conclusion that plaintiffs' breach claims in this court violate the first *Klamath* test.[12]

But what of plaintiffs' temporary takings claim, which allege the takings of a flowage easement?  Plaintiffs did not separately raise a takings claim in the district court, after all. However, in enumerating the harms caused by the Cushman Project, plaintiffs pled a litany of claims relating to flooding and inundations.  Thus, at various points in their district court complaint, they asserted that the construction, maintenance and operation of the Cushman Project "flooded approximately 18 miles of the North Fork" and thereby "expropriated and converted to use the entire North Fork Skokomish River at the project denying Plaintiff's right to water sufficient to fulfill the purposes for which the Skokomish Indian Reservation was established."  They also claimed that the Cushman Project "inundated . . . Plaintiff's treaty-protected usual and accustomed fishing grounds;" "inundate[d] . . . [Plaintiffs'] archaeological, cultural, historic, and religious sites and resources, and access to such resources;" "expropriated and occupied limited prime usable land;" "increased the incidence of overbank flooding;" "eliminated navigation on the [North Fork] . . . caus[ing] Plaintiffs' loss of access to riverfront property;" and "destroyed, occupied, or otherwise damaged Plaintiffs' rights to fee and trust land within the Skokomish River watershed."  In the court's view, these flooding/inundation claims were incorporated into plaintiffs' claims against defendant in the district court.  And they are also

---

[11]  For example, in the first damages claim (for negligence), plaintiffs averred:  "Federal law, including but not limited to [the FPA], prohibits FERC from issuing a license within any reservation without a finding that the license will not interfere or be inconsistent with the purpose for which the reservation was created or acquired, and requires the license to contain conditions that the Secretary of the department under whose supervision such reservation falls deems necessary for the adequate protection and utilization of the reservation."  In the second damages claim (trespass), plaintiffs averred that "Defendant United States, mainly acting through the BIA and FERC and their respective employees and agents, unlawfully authorized Defendant Tacoma's construction, operation, and maintenance of the Cushman Project and continues to do so by (1) issuing an original 'license;' (2) issuing annual licenses; [and] (3) issuing a subsequent major license . . . ."

[12]  Plaintiffs' complaint here asserts in the jurisdictional segment that "this action involves a claim against the United States" arising under "section 4(e) of the Federal Power Act."  In the background facts section (which is incorporated into the later damage claims), the complaint goes on to make multiple references to the FPA in citing alleged failures by FERC and the Secretary of the Interior to protect the Tribe and its reservation.  While these background facts are incorporated into all three of plaintiffs' damages claims, plaintiffs' second breach claim heavily focuses on the FPA and defendant's alleged breach of the duties imposed by that statute.

the core of plaintiffs' temporary takings claim here.  The issues of fact and law encountered in these claims are thus the same.  Accordingly, the court concludes that plaintiffs' temporary takings claim involves the same operative facts as its flooding-related claims in the district court.

While an adverse result under any one of the *Klamath* test satisfies the "operative facts" prong of section 1500, *see Klamath*, 113 Fed. Cl. at 708, it is readily apparent that the respective claims at issue fail the remaining three *Klamath* tests, as well.

The second *Klamath* test focuses on whether a hypothetical or actual adverse merits decision on the earlier claim would trigger the doctrine of *res judicata*, so as to bar a subsequent suit on the later-filed claim.  The doctrine of *res judicata* bars "repetitious suits involving the same cause of action" once "a court of competent jurisdiction has entered a final judgment on the merits."  *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948); *see also Bush v. United States*, 717 F.3d 920, 926 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 966 (2014).  In *Trusted Integration*, the Federal Circuit emphasized that the *res judicata* principles relevant for this purpose are those "which were in force at the time the predecessor to § 1500 was enacted," and not the modern tests for claim preclusion.  The court identified two versions of the test that could be applied – the "act or contract test" and "the evidence test."  659 F. 3d at 1168–69 (citing *Tohono*, 131 S.Ct. at 1730); *see also McKown*, 114 Fed. Cl. at n.3; *Klamath*, 113 Fed. Cl. at 712; *Goodeagle v. United States*, 105 Fed. Cl. 164, 176 n.9 (2012).

As described in *Tohono*, the "act or contract" test distinguishes "between demands or rights of action which are single and entire, and those which are several and distinct[;] the former immediately arise out of one and the same act or contract, and the latter out of different acts or contracts."  131 S. Ct. at 1730 (quoting J. Wells, Res Adjudicata and Stare Decisis § 241, p. 208 (1878)); *see also Trusted Integration*, 659 F.3d at 1169; *U.S. Home Corp. v. United States*, 108 Fed. Cl. 191, 197 (2012), *aff'd*, 2014 WL 128616 (Fed. Cir. Jan. 15, 2014).  Under this test, "where the respective demands grow out of independent acts, contracts or transactions, they cannot be treated as parts of a single cause."  *Klamath*, 113 Fed. Cl. at 712-13 (citing *inter alia United States v. Cal. & Ore. Land Co.*, 192 U.S. 355, 358–59 (1904)); *see also* Corpus Juris Secundum § 1000 (2013).  By comparison, under the evidence test for *res judicata*, the question asked was "would the same evidence support and establish both the present and the former cause of action?"  *Tohono*, 131 S.Ct. at 1730 (quoting 2 Henry Black, A Treatise on the Law of Judgments § 726 (1891) (hereinafter "Black's Judgments")); *see also Trusted Integration*, 659 F.3d at 1169; *U.S. Home Corp.*, 108 Fed. Cl. at 197.  "If so, the former recovery is a bar; if otherwise, it does not stand in the way of a second action."  2 Black's Judgments § 726; *see also Klamath*, 113 Fed. Cl. at 713.

Applying these historical tests, it is apparent that a hypothetical adverse merits decision on either plaintiffs' APA claim or even the FPA component of their tort claims would trigger the doctrine of *res judicata*.  All plaintiffs' claims – those that were resolved in the district court and those that were, in effect, transferred here – involve the same acts and contract, with the latter, of course, being the Treaty upon which most of plaintiffs' claims are based.  It cannot be said that these two sets of claims derive from independent acts or contracts.  Moreover, it is beyond peradventure that the same essential evidence supports and establishes both sets of claims.  *See*

- 14 -

*Klamath*, 113 Fed. Cl. at 713-14; *see also Trusted Integration*, 659 F.3d at 1170.  Accordingly, the principles of *res judicata* established in *Tohono* and other cases reinforce the conclusion that the nontransferred and transferred claims against the United States involve the same operative facts for purposes of section 1500.

The third *Klamath* test focuses on whether plaintiffs will rely on substantially the same evidence to support each of the two claims.  Such has been held not to be the case if the facts relating to the subsequent claim "differ in both time and type from those" in the original claim. *Mayle v. Felix*, 545 U.S. 644, 650 (2005); *see also Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013); *U.S. ex rel. Miller v. Bill Harbert Intern. Const.*, 608 F.3d 871, 881 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 2443 (2011).  Under this formulation, two claims are not the same if the second claim "is to fault [the defendants] for conduct different from that identified in the original complaint," even if the new claim "shares some elements and some facts in common" with the original claim.  *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009); *see also Full Life Hospice*, 709 F.3d at 1018; 6A Wright & Miller, *supra*, at § 1497. Here, unfortunately for plaintiffs, there is neither a temporal nor categorical distinction between their claims here and those against the United States that were dismissed by the district court. This case is neither like *Klamath* nor *Petro-Hunt*, in which the acts that were the subject of the prior district court complaint were earlier in time and distinct in nature from those that were the subject of the later action in this court.  *See Klamath*, 113 Fed. Cl. at 710-11 (district court action sought to prevent implementation of BLM plan; CFC action sought damages for takings when plan was implemented); *Petro-Hunt*, 105 Fed. Cl. at 45 (district court action did not prevent court from exercising jurisdiction over later-arising judicial takings claim).

The final *Klamath* test asks if there is any other logical relationship between the two claims.  This fourth test, which like the others derives from the joinder rules in the Federal Rules of Civil Procedure, "is designed to determine whether there is some logical relationship between the two claims that is not revealed by the first three tests."  *Klamath*, 113 Fed. Cl. at 717. "Reflecting its interstitial role, the hallmark of this final test is flexibility." *Id.* (citing, *inter alia*, *Bd. of Regents of Univ. of Wisc. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 470 (7th Cir. 2011)).  The requisite nexus thus may take various forms.  It may exist, for example, where a "transaction may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."  *In re Kaiser Grp. Intern.*, 399 F.3d 558, 569 (3d Cir. 2005) (quoting *In re Gordon Sel-Way*, 270 F.3d 280, 287 (6th Cir. 2001)); *see also Klamath*, 113 Fed. Cl. at 717.  Or it may exist "if there is substantial evidentiary overlap in the facts giving rise to the [causes] of action," *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012), or where "separate trials on each of the claims would 'involve a substantial duplication of effort and time by the parties and the courts,'" *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 836 n.9 (3d Cir. 2011) (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir.1978)).  Lastly, this test may be triggered where the "facts, upon which the claim rests, [activate] additional legal rights" supporting the other claim. *Repub. Health Corp. v. Lifemark Hosp. of Fla.*, 755 F.2d 1453, 1455 (11th Cir. 1985); *see also Iglesias v. Mut. Life Ins. Co. of N.Y.*, 156 F.3d 237, 242 (1st Cir. 1998), *cert. denied*, 528 U.S. 812 (1999); *Montgomery Elevator Co. v. Building Eng'g Serv.*, 730 F.2d 377, 380 (5th Cir.1984).

- 15 -

Although it is unnecessary to explore fully every aspect of the logical relationship between plaintiffs' two suits, it is sufficient to note that there are various nexuses between the claims that were resolved by the district court and affirmed by the Ninth Circuit and the claims before this court.  For example, as in other cases, "it is readily apparent that separate trials on [plaintiffs' district court and CFC] claims would have involved a substantial duplication of time and effort by the parties and the courts involved."  *Klamath*, 113 Fed. Cl. at 717; *see also Barefoot Architect*, 632 F.3d at 836 n.9;  *McKown*, 114 Fed. Cl. at 557.  This is because "there is substantial overlap in the facts giving rise to the cause[s] of action."  *In re EMC*, 677 F.3d at 1358; *see also Klamath*, 113 Fed. Cl. at 717.

Based on the foregoing, the court concludes that plaintiffs' claims in this case are "for or in respect to" the claims against the United States that were dismissed by the district court.  As such, section 1500 applies to them and they must be dismissed for lack of jurisdiction.[13]

## III.   CONCLUSION

Though plainly dictated by binding precedent, neither the reasons for, nor the wisdom of, the result here are immediately apparent to the undersigned.  True, plaintiffs could have avoided many problems had they simply filed in this court first, particularly given the order-of-filing rule in *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), *cert. denied*, 382 U.S. 976 (1966).  But, one would think that the transfer statute, section 1631, would provide a preeminent means for remedying the sort of problems encountered here.  The Ninth Circuit thought so. Apparently not.

Can it be that Congress intended jurisdiction in a case transferred here to turn on an intermixing of metaphysics and happenstance?[14]  Did Congress really believe that the same district court complaint should be deemed "simultaneously-filed" with a complaint here for purposes of section 1631, but previously-filed, *i.e.,* "pending," for purposes of section 1500?  ,

----

[13]   As an alternative to its section 1500 arguments, defendant questions the Ninth Circuit's reliance on section 1631 to transfer tort claims to this court on the assumption that they would be reformulated into claims cognizable under the Tucker Act, 28 U.S.C. § 1491(a)(1), or the Indian Tucker Act, 28 U.S.C. § 1505.  It argues that this was an improper use of section 1631.  Based on this view, it further contends that plaintiffs' claims in this court should be viewed as having been filed on the date they filed their transfer complaint, making them untimely under the six-year statute of limitations found in 28 U.S.C. § 2501.  The court need not reach this alternative jurisdictional argument.  *See generally*, *United States Marine, Inc. v. United States*, 722 F.3d 1360, 1365 (Fed. Cir. 2013) (Federal Circuit must affirm transfer order by court of appeals unless it concludes the transfer was not "plausible").

[14]   When talking about metaphysics, it is, of course, accepted practice to employ quodlibetical questions.  *See* Thomas Aquinas, *Summa Theologica* (Washbourne 1914) (*see*, in particular, question 90).

- 16 -

And did that legislative body really intend section 1500 to prime this court's jurisdiction if a district court dismissed a questionable claim and then transferred the remainder of the case to this court, but not if the district court, out of an abundance of caution, transferred all the claims – questionable *vel non* – to this court?[15]  What purpose is served by applying these overly fine distinctions – other than trapping the unwary (or even the wary)?  If current precedent is correct, one thing is abundantly clear – Congress must have  intended to accomplish very little, indeed, in passing section 1631, at least insofar as this court is concerned.  *See Griffin*, 85 Fed. Cl. at 193-194; *see also D'Abrera*, 78 Fed. Cl. at 56 n.10 ("[t]he transfer provisions of Section 1631 were enacted to cure jurisdictional defects, but *County of Cook* disables that cure by superimposing a policy-based interpretation of Section 1500").  Perhaps, the "curiouser and curiouser" results reached in cases like this will eventually convince the Federal Circuit to revisit *County of Cook*. *See Griffin v. United States*, 621 F.3d 1363 (Fed. Cir. 2010) (declining, on a 6-3 vote, to review *County of Cook*, sitting *en banc*).  *Spes oritur aeternum*.

The court need go no further.[16]  For the reasons stated, the court hereby **GRANTS** defendant's motion to dismiss under RCFC 12(b)(1) and orders the Clerk to dismiss the complaint for lack of jurisdiction.  No costs.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[15]  In the latter instance, there would have be no claims against the United States left in the district court upon which to predicate the application of section 1500.  *See County of Cook*, 170 F.3d at 1091 n.8, discussed *supra* note 8.  Now, of course, one might question whether such a wholesale transfer of claims would be a proper use of section 1631, which anticipates that the transferred case could have been brought in the transferee venue.

[16]  Defendant's motion raises a variety of issues under RCFC 12(b)(6) that this court need not reach.